IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

**FILED**

**JAN 16 2026**

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
TOLEDO

PETER BARNHART )
BARNHART BUILDERS LLC )
)
    Plaintiffs, )
)
v. )
)
RURAL 1ST and )
FARM CREDIT MID-AMERICA, )
ZACHARY SELVEY, )
DEWEY, SELVEY & LISKA, ATTORNEYS, )
JESSICA SCHMIDT, )
BRIAN SCHMIDT, )
JASON FILIPUCCI, )
NINA FILIPUCCI, )
JOHN DOES 1–20, )
)
    Defendants. )
)

Case No.

**3:26 CV 0118**

Judge:

**JUDGE KNEPP**

**MAG JUDGE CLAY**

COMPLAINT

## I. INTRODUCTION

1. This action arises from a coordinated financial takeover of multiple residential construction projects by homeowners, their attorney, and a federally regulated construction lender, who jointly used control of federally regulated loan proceeds and wire-based disbursement instructions to seize job sites, divert the agreed wire arrangements away from Plaintiffs and into Defendants' control, and force Plaintiffs out while retaining the full benefit of Plaintiffs' labor without ever transmitting the contractually required wire payments to Plaintiffs for the work Plaintiffs completed, instead directing those funds to Defendants.

2. Plaintiff Barnhart Builders LLC, acting through its principal and project manager, Plaintiff Peter Barnhart, was retained as the general contractor to construct custom residences for Defendants Jessica and Brian Schmidt and, in a separate project, Defendants Jason and Nina Filipucci, pursuant to written construction agreements. In connection with the

Schmidt project, Defendants Jessica and Brian Schmidt entered into a construction loan administered by Defendant Rural 1st and Farm Credit Mid-America. That loan included a written disbursement authorization requiring that all loan proceeds for completed work be paid directly to Barnhart Builders. By executing, controlling, and administering that disbursement system, Rural 1st assumed contractual duties under the loan's disbursement authorization and undertook lender-administered escrow and electronic disbursement functions that were integral to the transmission and control of construction-loan proceeds.

3. Relying on that lender-controlled payment structure, Plaintiffs mobilized subcontractors, coordinated inspections, purchased materials, and performed substantial portions of the construction, thereby earning progress payments under the draw system controlled by Rural 1st.

4. Before any default, termination, or bona fide dispute existed — and none has been identified to date — Defendant Jessica Schmidt attempted to submit a draw request in excess of $100,000 seeking to have loan proceeds paid directly to the homeowners instead of the contractually designated builder, despite the written disbursement authorization requiring payment to Barnhart Builders. Although that initial attempt was rejected, it demonstrated Defendants' effort to take control of the project's payment stream and bypass the designated payee. More than two months after Defendants first blocked Plaintiffs' access to the loan proceeds, Defendants still have not identified any contemporaneous default, performance deficiency, or contractual basis that would have justified altering the agreed wire-disbursement arrangement.

5. Thereafter, Defendants began communicating directly with the lender to circumvent the agreed draw-and-wire disbursement process. With the cooperation and participation of

2

Defendant Rural 1st, Defendants blocked and redirected draw payments and their associated wire transfers away from Plaintiffs and into the homeowners' control. This diversion deprived Plaintiffs of the funds required to continue performance, severed Plaintiffs' ability to pay subcontractors, and made continued work commercially impracticable, thereby forcing a constructive termination through lender-enabled financial obstruction rather than any failure of performance by Plaintiffs.

6. Enabled by Defendant Rural 1st's control over the project's draw-and-wire disbursement system, Defendants assumed control of the job site, directed subcontractors, coordinated inspections, and otherwise stepped into the role of general contractor, despite having no contractual or legal right to do so. In doing so, Defendants appropriated the construction operation Plaintiffs had already built — including Plaintiffs' subcontractor network, negotiated pricing, schedules, sequencing, and project infrastructure — and used it as their own to complete the home without paying for the work and planning already embedded in it.

7. To facilitate this takeover, Defendants made false and misleading statements to Plaintiffs' subcontractors, including falsely suggesting that Plaintiffs had manipulated or inflated pricing, in order to undermine Plaintiffs' credibility and justify Defendants' seizure of the project and the redirection of the payment stream. After depriving Plaintiffs of both payment and professional standing, Defendants declared the contract terminated and retained the value of Plaintiffs' completed work while diverting the wire transfers that were contractually required to be paid to Plaintiffs for that same work.

8. After Defendants had constructively terminated Plaintiffs' contract by blocking payment and depriving Plaintiffs of the funds required to continue performance, Plaintiffs recorded

3

mechanic's liens to protect their rights. Defendant Rural 1st then froze the remaining loan funds as to Plaintiffs while continuing to permit project funding for Defendants' takeover and assumed exclusive control over the escrowed construction proceeds. Despite knowing that Plaintiffs had performed the work, that no judicially established default existed, and that the loan documents required payment to Barnhart Builders, Rural 1st did not remain neutral. Instead, it permitted Defendant Schmidt to operate as the de facto general contractor while denying Plaintiffs access to the loan proceeds that funded the work Plaintiffs had already performed.

9. Although Rural 1st represented that "loan funds are paused during this time and funds cannot be sent while the lien is unresolved," it nevertheless permitted Defendants to control the project and transferred Plaintiffs' earned draws to the homeowners without first resolving the lien or obtaining any judicial determination. By freezing Plaintiffs out while funding Defendants' takeover, Rural 1st used its control of federally regulated loan proceeds to pick sides, finance the seizure of the project, and directly cause Plaintiffs' losses.

10. This conduct was not isolated. Defendant Schmidt and Defendant Selvey employed the same tactics using the same pattern of lender interference, false default claims, and payment obstruction with another of Plaintiffs' customers, Defendants Jason and Nina Filipucci, in a separate project, using direct lender communications, payment obstruction, engineered termination, and coordinated financial pressure to force Plaintiffs out while retaining the benefit of Plaintiffs' work. As part of that coordinated conduct, Defendant Selvey terminated Plaintiffs' contract with the Filipuccis without any prior notice of

default, opportunity to cure, or identification of any legitimate dispute, using the appearance of legal process to effect the same financial displacement.

11. The result was not a good-faith contractual disagreement, but a calculated financial ambush executed through control of a federally regulated, wire-based construction-loan payment system. Plaintiffs were deprived of earned draw payments, stripped of their contractual position as general contractor, exposed to unpaid subcontractor claims, and left bearing the costs of labor and materials now embedded in Defendants' homes. Defendants retained the value of Plaintiffs' work while Plaintiffs absorbed the financial loss.

12. Defendants' conduct further fractured Plaintiffs' relationships with subcontractors, disrupted other active and prospective projects, damaged Plaintiffs' reputation in the local construction community through false narratives regarding performance and financial integrity, and impaired Plaintiffs' standing with lenders and suppliers by falsely portraying Plaintiffs as being in default or unreliable. These harms were the natural and foreseeable result of Defendants' coordinated misuse of lender-controlled payment systems. To date, more than two months after Defendants first blocked Plaintiffs' access to the loan proceeds, Defendants have never provided Plaintiffs with any notice of default, identified any specific performance deficiency, or articulated any contractual basis for their conduct, and Plaintiffs continue to suffer substantial damages as a result.

13. This action seeks to hold Defendants accountable for their joint misconduct, including tortious interference, conversion, civil conspiracy, and lender-level bad faith and financial misconduct, and to recover the damages caused by Defendants' deliberate misuse of federally regulated loan mechanisms to appropriate Plaintiffs' work without paying for it

and to prevent those lending systems from being used as tools of financial predation against contractors who perform in good faith.

## II. SUMMARY OF CLAIMS

14. This action arises from a deliberate and coordinated scheme carried out by an **association-in-fact enterprise** consisting of homeowners, their attorney, and a federally regulated construction lender, whose **common purpose** was to remove Plaintiffs from active construction projects after substantial performance **by manipulating lender-controlled, interstate wire and electronic disbursement systems** to freeze, divert, and reroute construction-loan proceeds, while retaining the full economic value of Plaintiffs' labor, jobsite infrastructure, subcontractor relationships, and project momentum without paying for that value.

15. The scheme was initiated by Defendant **Jessica Schmidt**, who **associated with and participated in the affairs of the enterprise** by targeting the project's payment stream. After Plaintiffs had assembled the workforce, subcontractors, schedules, pricing structure, and operational systems necessary to complete the work, and **in the absence of any bona fide performance dispute**, Schmidt sought to retain Plaintiffs' embedded overhead and anticipated overhead and profit associated with unperformed portions of the contract **by removing Plaintiffs, personally assuming control of the project in the role of general contractor, and attempting to initiate a construction-loan draw in the amount of approximately $118,088.43 with herself designated as the payee**, notwithstanding the agreed-upon **wire-based disbursement method requiring payment to Plaintiffs** under the construction loan administered by Defendant **Rural 1st**.

16. Although Schmidt's initial attempt to redirect a six-figure construction-loan draw to herself was **initially rejected by Rural 1st**, the scheme **escalated following the involvement of Defendant Zachary Selvey**, who joined and furthered the enterprise by supplying legal positioning designed to overcome the payment controls governing the draw process. After Plaintiffs completed substantial work that was inspected and approved through the lender's draw process, and for which a draw had been generated subject only to routine borrower authorization, Defendants targeted a construction-loan draw in the amount of approximately **$144,000** generated by Plaintiffs' completed work and **caused those funds, through Defendant Rural 1st's lender-controlled electronic and interstate wire disbursement systems, to be redirected away from Plaintiffs and into the control of Defendant Jessica Schmidt**.

17. Defendant **Selvey** conducted and participated in the affairs of the enterprise **through a pattern of racketeering activity** by acting not merely as legal counsel, but as an **active coordinator** who supplied the legal and procedural mechanisms necessary to convert a manufactured dispute into a financial cutoff. Through termination positioning characterized as "for-cause," and through **lender-facing communications transmitted via interstate channels and directed at the administration of wire-based draw disbursements**, Selvey facilitated the obstruction of contractually required payment streams and provided the justification used to freeze Plaintiffs out of construction-loan proceeds.

18. Defendant **Rural 1st / Farm Credit Mid-America**, a federally chartered and federally regulated Farm Credit System lender engaged in interstate commerce, **knowingly participated in the enterprise's conduct** by exploiting its control over **draw approvals,**

**escrow administration, and interstate electronic and wire-based disbursement channels** to freeze, divert, and reroute construction-loan funds away from Plaintiffs. These actions occurred notwithstanding written loan disbursement authorizations designating Plaintiffs as the payee for completed work, while Defendants were simultaneously permitted to take over and continue the project using the workforce, subcontractors, schedules, and jobsite infrastructure Plaintiffs had assembled.

19. The conduct described herein was **not isolated**, but instead constituted a **repeatable scheme** reflecting both **closed-ended and open-ended continuity**, centered on the use of lender-controlled wire systems, termination positioning, and payment obstruction as leverage. With the involvement and assistance of Defendant Selvey, Defendants **Jessica Schmidt and Jason Filipucci**, who maintained a longstanding personal relationship and regular communication, **coordinated and replicated the same methods** across multiple construction projects.

20. In furtherance of the enterprise and as part of the same pattern of racketeering activity, Defendant **Selvey** issued a purported termination letter on the **Filipucci project** without any prior notice of default, without any opportunity to cure, and without any contemporaneous performance dispute, **using the appearance of legal process to trigger payment obstruction and financial displacement** in the same manner previously employed on the Schmidt project.

21. Schmidt's success in removing Plaintiffs without payment and redirecting lender-controlled funds informed and encouraged Filipucci to adopt the same strategy to avoid outstanding contract balances, overhead obligations, and anticipated profits. Each Defendant **played a distinct but complementary role** in furtherance of the enterprise's

common purpose, knowingly agreeing and acting together to remove Plaintiffs after substantial performance, retain the economic value Plaintiffs created, and **redirect or withhold construction-loan funds through coordinated legal positioning and lender-controlled interstate disbursement mechanisms**.

22. As a direct and proximate result of Defendants' **racketeering conduct and conspiracy**, Plaintiffs were injured in their business and property, including through unpaid construction draws, withheld retainage, loss of contract balances, loss of anticipated profits, destruction of subcontractor and lender relationships, reputational damage within the construction and lending community, and cascading business losses, as further documented by the exhibits incorporated into this Complaint.

### III. JURISDICTION AND VENUE

23. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert federal claims under RICO, 18 U.S.C. § 1962, and because the scheme alleged herein was executed through the use and manipulation of federally regulated banking infrastructure, including lender-administered escrow and electronic disbursement channels used to transmit and control construction-loan proceeds. Defendant Rural 1st's lender-controlled administration of draw approvals, escrowed funds, and electronic disbursements forms a central mechanism of the misconduct alleged and is integral to Plaintiffs' federal claims.

24. This Court has subject-matter jurisdiction pursuant to **28 U.S.C. § 1331** and **18 U.S.C. § 1964(c)** because Plaintiffs assert civil claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), **18 U.S.C. § 1962**, arising from Defendants' use of **interstate wire communications and federally regulated financial institutions** in the conduct of

the enterprise alleged herein. Plaintiffs were injured in their business and property **by reason of** Defendants' violations of **18 U.S.C. § 1962**.

25. This Court has supplemental jurisdiction over the remaining Defendants and state-law claims pursuant to **28 U.S.C. § 1367(a)** because those claims form part of the same case or controversy as Plaintiffs' federal claims and arise from a common nucleus of operative fact. The state-law claims are not independent of the federal misconduct alleged, but instead arise directly from the same lender-controlled draw process, escrow authority, interstate wire communications, and coordinated conduct that form the basis of Plaintiffs' federal claims under RICO and federal law. Accordingly, the state-law claims do not predominate, raise no novel or complex issues of state law, and are appropriately resolved in this Court alongside Plaintiffs' federal claims.

26. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this District, including the construction of the residences, the performance of Plaintiffs' work, the lender inspections, the submission and diversion of draw requests, the mechanic's liens, and Defendants' interference with Plaintiffs' contractual and business relationships.

27. Parallel proceedings concerning certain portions of these disputes are pending in state court. Those actions do not include all Defendants, do not address Defendant Rural 1st's federally regulated lending misconduct, and do not provide complete relief for Plaintiffs' claims. Accordingly, those proceedings do not bar this Court's exercise of jurisdiction, and federal adjudication is necessary to resolve the full scope of Defendants' coordinated scheme.

## IV.    PARTIES

28. Plaintiff Barnhart Builders LLC is an Ohio limited liability company engaged in residential and light-commercial construction, with its principal place of business in Ohio. Barnhart Builders served as the general contractor for the Schmidt and Filipucci projects and performed substantial construction, coordination, and financial administration for both projects

29. Plaintiff Peter Barnhart is a citizen of the State of Ohio and the principal and operating project manager of Barnhart Builders LLC. At all relevant times, Mr. Barnhart personally performed the day-to-day functions of the general contractor on the Schmidt and Filipucci projects, including scheduling, subcontractor coordination, budgeting, inspections, and lender communications, and was individually targeted by Defendants' interference, misrepresentations, and financial sabotage, which also caused direct harm to his professional reputation and standing in the construction and lending community.

30. Defendant Rural 1st and Farm Credit Mid-America is a federally chartered Farm Credit System financial institution operating under the Farm Credit Act, 12 U.S.C. § 2001 et seq., authorized to make and service construction loans and to control, administer, and disburse escrowed loan proceeds. At all relevant times, Rural 1st exercised control over the construction loan for the Schmidt project, including draw approvals, escrow management, and payment disbursements.

31. Defendants Jessica Schmidt and Brian Schmidt are individuals who are the homeowners and borrowers for the Schmidt project. At all relevant times, they acted individually and in concert to interfere with Plaintiffs' contractual and business relationships, seize control of loan proceeds, take over the construction project, and retain Plaintiffs' work without paying for it.

11

32. Defendants Jason Filipucci and Nina Filipucci are individuals who are the homeowners and borrowers for the Filipucci project. At all relevant times, they acted in coordination with Defendant Schmidt and Defendant Selvey to interfere with Plaintiffs' contractual rights, terminate Plaintiffs' involvement without cause, and retain the benefit of Plaintiffs' work, including through lender communications and payment-related actions.

33. Defendant Zachary Selvey is an attorney licensed to practice in the State of Ohio who, at all relevant times, personally participated in and directed the conduct alleged herein, including communications with Defendant Rural 1st, issuance and enforcement of false termination and default positions to lenders and third parties, coordination between homeowner defendants, and actions designed to obstruct payment to Plaintiffs and facilitate Defendants' takeover of the projects.

34. Defendant Dewey, Selvey & Liska, Attorneys is an Ohio law firm that, at all relevant times, employed, authorized, and/or ratified the acts of Defendant Zachary Selvey as alleged herein. The firm is vicariously liable for Defendant Selvey's conduct under principles of agency, respondeat superior, and joint participation.

35. Defendants John Does 1–20 are individuals and/or entities whose true names and capacities are presently unknown to Plaintiffs but who participated in, authorized, directed, processed, approved, implemented, or concealed the wrongful conduct alleged herein, including, without limitation, those who participated in the diversion, freezing, rerouting, or misapplication of construction-loan proceeds, the alteration or override of wire and disbursement instructions, the approval of draw requests while blocking payment to Plaintiffs, and the coordination of lender and homeowner actions to deprive Plaintiffs of

12

payment. Plaintiffs will amend this Complaint to substitute the true names and capacities of the John Doe Defendants when they are discovered.

36. Upon information and belief, Defendants John Does include officers, employees, loan processors, draw administrators, wire-transfer personnel, compliance personnel, supervisors, and agents of Defendant Rural 1st and Farm Credit Mid-America, as well as other persons who knowingly assisted Defendants Schmidt, Filipucci, and Selvey in the scheme to divert escrowed loan funds, interfere with Plaintiffs' contracts, and seize Plaintiffs' work without payment.

37. Each John Doe Defendant is liable as a principal, aider and abettor, co-conspirator, and/or participant in the enterprise and wrongful acts described herein, and acted within the scope of their employment, agency, or authority in furtherance of Defendants' common plan and scheme.

38. As used in this Complaint, "Defendant Selvey" refers collectively to Defendant Zachary Selvey and Defendant Dewey, Selvey & Liska, Attorneys. "Defendant Schmidt" refers collectively to Jessica Schmidt and Brian Schmidt. "Defendant Filipucci" refers collectively to Jason Filipucci and Nina Filipucci.

39. At all relevant times, Defendants acted individually and in concert, pursuant to a common plan and scheme, to interfere with Plaintiffs' contractual and business relationships, divert construction loan proceeds, deprive Plaintiffs of payment for completed work, and enable Defendants to seize and retain the benefit of Plaintiffs' labor, with knowledge that such conduct would cause Plaintiffs substantial financial and business harm.

## V.  FACTUAL BACKGROUND

### A. The Construction Contracts and Loan Structure

13

40. Plaintiff Barnhart Builders LLC, acting through its principal and project manager, Plaintiff Peter Barnhart, entered into written construction agreements with Defendants Jessica and Brian Schmidt for the construction of a custom residence. Plaintiffs likewise entered into a separate written construction agreement with Defendants Jason and Nina Filipucci for the construction of a separate residence.

41. In connection with the Schmidt project, Defendants Jessica and Brian Schmidt obtained a construction loan administered by Defendant Rural 1st and Farm Credit Mid-America. As part of that loan, the Schmidts executed a written disbursement authorization directing that all construction loan proceeds for completed work be paid directly to Barnhart Builders as the general contractor. Defendant Rural 1st accepted and implemented that authorization as part of its lender-controlled draw system and federally regulated wire-transfer and escrow system, thereby establishing Barnhart Builders as the designated payee entitled to receive construction loan proceeds for work performed. A true and correct copy of the borrower-executed and lender-accepted disbursement authorization is attached as Exhibit A.

42. Defendant Rural 1st exercised exclusive operational control over draw approvals, inspections, escrowed loan funds, and payment disbursements under the construction loan; however, its authority to release funds was contractually governed by the borrower-executed and lender-accepted disbursement authorization designating Barnhart Builders as the payee for completed work. Rural 1st therefore controlled the timing and processing of disbursements, but not the identity of the party entitled to receive payment, which was fixed by that disbursement authorization.

14

43. Plaintiffs reasonably and foreseeably relied on Rural 1st's acceptance and implementation of the disbursement authorization and draw system in mobilizing subcontractors, ordering materials, extending credit, and performing construction work, with the understanding that completed work approved through Rural 1st's inspection and draw process would be paid directly to Plaintiffs as the designated payee.

## B. PLAINTIFF'S PERFORMANCE

44. Plaintiffs timely mobilized subcontractors, scheduled and passed lender-required inspections, ordered and paid for materials, and performed substantial construction on both the Schmidt and Filipucci projects in accordance with the parties' written contracts and the lender-administered draw schedule, with such performance being repeatedly verified and approved through the lenders' inspection and draw-approval systems. A true and correct copy of Rural 1st's framing and rough-in inspection reflecting approval of Plaintiffs' work is attached as Exhibit J.

45. At all times prior to Defendants' interference, Plaintiffs were actively performing, had not been declared in default, had not received any notice of breach or opportunity to cure, and had not been identified by any Defendant or lender as being in material non-performance at the time Defendants began blocking and diverting payments. To date, Defendants have never issued any valid notice of default or contractual basis for withholding Plaintiffs' earned payments.

46. Based on completed work, passed inspections, and lender-approved draw requests, Plaintiffs earned and were contractually entitled to progress payments from the construction loan proceeds through the lender-controlled wire and disbursement system.

## C. DEFENDANTS' FIRST ATTEMPT TO SEIZE CONTROL OF LOAN PROCEEDS

47. Before any dispute, default, or termination existed, Defendant Jessica Schmidt attempted to submit a six-figure draw request seeking to have construction-loan proceeds paid directly to the homeowners rather than to Plaintiffs, in direct violation of the borrower-executed and lender-accepted disbursement authorization designating Barnhart Builders as the sole payee for completed work.

48. Although that attempt was initially rejected, it constituted an overt act to override the Payee Designation, divert lender-controlled funds, and seize control of the project's financial stream, and it marked the beginning of Defendants' coordinated scheme to bypass Plaintiffs and appropriate the proceeds of Plaintiffs' labor.

## D. PAYMENT INTERFERENCE AND LENDER PARTICIPATION

49. While Plaintiffs were still actively performing, had passed lender inspections, and were contractually entitled to payment, Defendants began communicating directly with Defendant Rural 1st in order to bypass, override, and undermine the borrower-executed and lender-accepted disbursement authorization and the agreed draw-and-wire payment process. Defendants also attempted to remove or alter the executed disbursement authorization documents from the lender-controlled DocuSign file, as reflected in Exhibit B.

50. Acting in coordination with Defendants, and in direct violation of the borrower-executed and lender-accepted payment instructions, Defendant Rural 1st blocked, froze, and—on the Schmidt project—redirected draw payments and their associated wire disbursements away from Plaintiffs and into the homeowners' control, despite knowing that Plaintiffs were the designated payee for completed work. **At the same time and prior to any such diversion of funds, Defendant Jessica Schmidt confirmed in writing that $91,008.71**

**was undisputedly owed for Plaintiffs' completed work.** A true and correct copy of that written confirmation is attached as **Exhibit F**.

51. Although Rural 1st represented to Plaintiffs that "loan funds are paused during this time and funds cannot be sent while the lien is unresolved," Rural 1st did not remain neutral. Instead, it permitted Defendant Schmidt to assume operational control of the project and, upon information and belief, authorized, processed, and transmitted construction-loan proceeds to the homeowners for work that had been performed by Plaintiffs, thereby funding Defendants' takeover while denying Plaintiffs their earned payments. Rural 1st's written representation disclaiming involvement while continuing to control escrow and disbursement functions is attached as Exhibit C.

52. This diversion and selective funding deprived Plaintiffs of the funds contractually and equitably required to pay subcontractors, procure materials, and continue performance, and served as the financial instrumentality by which Defendants were able to seize control of the projects, render Plaintiffs' continued performance commercially impracticable, and force Plaintiffs off the projects while Defendants took over and retained the value of Plaintiffs' work.

## E.  THE JOB-SITE TAKEOVER AND FINANCIAL MANIPULATION

53. At the same time Plaintiffs were cut off from the lender-controlled payment stream, Defendants assumed physical and operational control of the job sites, directed subcontractors, coordinated inspections, and otherwise stepped into the role of general contractor without any contractual, legal, or lender authorization. Defendant Schmidt's written acknowledgment that she had assumed control as the 'new GC' is attached as

Exhibit L. Defendant Rural 1st's written acknowledgment of Schmidt's GC takeover is attached as Exhibit M.

54. Defendants misappropriated Plaintiffs' subcontractor relationships, negotiated pricing, schedules, sequencing, and project information, and used Plaintiffs' established business infrastructure and trade relationships to continue and complete the projects for Defendants' own benefit, while excluding Plaintiffs from both control and payment.

55. On November 13, 2025, Defendant Jessica Schmidt submitted a draw request for approximately $19,000, which she represented was for septic-related expenses. That submission itself was unauthorized and improper because the borrower-executed and lender-accepted disbursement authorization required that all construction-loan proceeds for completed work be paid directly to Barnhart Builders as the designated payee, and Plaintiffs had relied on that authorization in advancing labor, materials, and subcontractor costs. Plaintiff Barnhart approved that request only because Schmidt represented that it reflected legitimate septic expenses.

56. Later that same day, that approved draw request disappeared from the lender's draw system and had been replaced by or converted into a draw request for approximately $118,088.43, which Plaintiff Barnhart did not submit, approve, or authorize. Lender records reflected that the $118,088.43 request was submitted in the name of Defendant Jessica Schmidt, and Defendant Rural 1st thereafter rejected that request. A true and correct copy of the homeowner-submitted $118,088.43 draw request is attached as Exhibit D.

57. This unauthorized draw escalation constituted an attempt to manipulate the lender-controlled wire-based payment system to seize control of the project's financing, and it

18

immediately preceded Rural 1st's freezing of Plaintiffs' access to funds and Defendants' takeover of the job sites.

58. At all relevant times during the foregoing draw manipulation, funding freeze, and job-site takeover on the Schmidt project, Defendant Zachary Selvey was in direct communication with Defendant Rural 1st on behalf of Defendant Schmidt regarding the construction loan, draw status, and project control, and acted as an intermediary and coordinator in the communications that accompanied Defendants' seizure of the Schmidt project while contemporaneously implementing the termination and takeover of the Filipucci project.

59. Defendants further made false and misleading statements to Plaintiffs' subcontractors to justify and facilitate their takeover. In particular, Defendant Schmidt told Brian Shortridge of Shortridge Construction that Plaintiff Barnhart had negotiated a $7,500 reduction in Shortridge's price for Defendants' benefit, in order to portray Plaintiffs as untrustworthy and rationalize Defendants' seizure of the projects. Defendants also falsely asserted that Plaintiffs had manipulated pricing, overbilled, or acted dishonestly, when in reality Plaintiffs' draw requests were submitted strictly in accordance with the lender-approved draw schedule administered by Defendant Rural 1st and were based on work actually performed.

60. These false statements, combined with Defendant Rural 1st's freezing and diversion of Plaintiffs' earned draw payments, caused subcontractors and vendors to lose confidence in Plaintiffs and to withdraw from or refuse to proceed with other projects, including Laws Electric and Shortridge Construction. Defendant Schmidt specifically told Brian Shortridge that Plaintiffs' money was "tied up" and that this would likely prevent Plaintiffs from paying subcontractors on other projects, thereby intentionally signaling financial instability

to sabotage Plaintiffs' business relationships. As a result, subcontractors deprioritized and ceased work on multiple unrelated projects with Plaintiffs after being misled into believing Plaintiffs were financially unstable or dishonest, even though those conditions were entirely manufactured by Defendants' misconduct.

## F. CONSTRUCTIVE TERMINATION AND RETENTION OF PLAINTIFF'S WORK

61. On the Schmidt project, Defendants cut off Plaintiffs' access to the lender-controlled payment stream, froze and diverted earned draw funds, blocked Plaintiffs' ability to pay subcontractors, and seized control of the job site, thereby rendering Plaintiffs' continued performance commercially impossible and effecting a constructive termination through financial and operational coercion rather than any lawful contractual process.

62. On the Filipucci project, Defendant Zachary Selvey, acting in coordination with the homeowner Defendants, issued a purported written "termination" of Plaintiffs' contract without any prior notice of default, opportunity to cure, or identification of any material breach, using the appearance of legal process to accomplish the same wrongful removal of Plaintiffs from the project that was achieved through lender interference on the Schmidt project.

63. Plaintiffs thereafter confirmed termination only after they had been stripped of funding, site access, and authority on the Schmidt project, and after Selvey's false termination had already displaced Plaintiffs on the Filipucci project, making continued performance impossible.

64. Defendants then retained, used, and monetized Plaintiffs' completed construction work, materials, labor, subcontractor arrangements, project planning, schedules, and in-place

improvements across both projects, while refusing to pay Plaintiffs the amounts contractually and equitably owed.

## G. THE LIENS AND ESCROW CONTROL

65. After Defendants wrongfully withheld payment for completed work and interfered with Plaintiffs' performance, Plaintiffs recorded mechanic's liens on the Schmidt project to protect their statutory and contractual rights to payment for work already performed.

66. Defendant Rural 1st thereafter froze the remaining construction loan funds and assumed exclusive control over the escrowed construction proceeds, exercising its authority as a federally regulated financial institution over the project's financing, disbursement, and wire-based payment system. After notice of dispute and lien, the lender-controlled DocuSign file reflecting executed disbursement records was purged, as shown in Exhibit N.

67. At the time Defendant Rural 1st froze the funds, it knew that Plaintiffs had performed the work, that no judicially established default or valid termination existed, and that Rural 1st had accepted and implemented a written disbursement authorization designating Barnhart Builders as the payee entitled to receive construction-loan proceeds for completed work. Despite those facts and obligations, Rural 1st refused to release Plaintiffs' earned draws.

68. During this same period, Defendant Zachary Selvey transmitted written communications contesting Plaintiffs' mechanic's lien and expressly warning that the lien would cause the lender to stop draw disbursements, thereby invoking lender-level control over escrowed construction funds and injecting legal pressure into the lender-controlled payment system.

69. Although Defendant Rural 1st thereafter represented to Plaintiffs that "loan funds are paused during this time and funds cannot be sent while the lien is unresolved," Rural 1st

did not remain neutral. Instead, while invoking the lien as a basis to withhold payment from Plaintiffs, Rural 1st continued to maintain control over the project's disbursement file, inspection system, and authorization records, permitted Defendant Schmidt to operate as the de facto general contractor, and allowed project funding and control to proceed for Defendants while denying Plaintiffs access to the escrowed, wire-based loan proceeds generated by Plaintiffs' completed work.

70. Upon information and belief, Defendant Rural 1st thereafter authorized and transmitted construction-loan funds through its disbursement and wire-transfer system to Defendant Schmidt for work performed by Plaintiffs, thereby transferring Plaintiffs' earned draws to the homeowners in violation of the borrower-executed and lender-accepted disbursement authorization designating Barnhart Builders as the payee.

71. By freezing Plaintiffs out of the payment stream while simultaneously permitting and funding Defendants' takeover of the project, Defendant Rural 1st used its control over escrowed, federally regulated construction-loan proceeds as a financial instrumentality to pick sides, finance the seizure of the project, and carry out Defendants' coordinated takeover, thereby directly and proximately causing Plaintiffs' damages, including unpaid labor and materials, loss of contract rights, loss of goodwill, and cascading harm to Plaintiffs' business.

72. Even after Defendant Rural 1st froze Plaintiffs out of construction-loan proceeds, the lender's inspector continued to contact Plaintiffs to perform draw inspections because Rural 1st continued to list Plaintiffs as the builder of record within its inspection and draw-approval system. Inspection documentation directed the inspector to contact Plaintiff Barnhart to schedule and conduct draw inspections on the Schmidt project, confirming that

22

Rural 1st simultaneously treated Plaintiffs as the performing general contractor for inspection and approval purposes while diverting or withholding the wire-based payment stream owed to them.

**H.  Cross-Project Coordination with the Filipucci Defendants**

73. Defendants Jessica Schmidt and Defendant Zachary Selvey knowingly coordinated the same payment-obstruction, termination, and project-takeover tactics with Defendants Jason and Nina Filipucci on a separate construction project. Defendants Schmidt and Filipucci had a pre-existing personal relationship, which facilitated communications, information-sharing, and coordinated action in furtherance of the scheme alleged herein.

74. Acting in concert with the Schmidt Defendants and without any contemporaneous notice of default, opportunity to cure, or identification of any material breach, Defendant Selvey issued a written "termination" of Plaintiffs' contract with the Filipuccis. This termination was not based on performance, but was used as a financial and reputational weapon to replicate the same payment-interference and project-takeover strategy executed in the Schmidt project.

75. As a direct result of Selvey's written termination, Plaintiffs were required to notify subcontractors, suppliers, that the Filipucci contract had been terminated, which Defendants then exploited to disrupt Plaintiffs' ongoing business relationships, impair Plaintiffs' credit and standing in the construction community, and falsely portray Plaintiffs as having been removed for cause when no such cause existed.

76. Defendants knew and intended that Selvey's termination notice would be communicated to Plaintiffs' construction lenders and financial counterparties and would be relied upon by those institutions in determining whether to continue funding Plaintiffs' projects, extend

credit, and honor draw requests. The issuance of a written "termination for cause" in an active construction project necessarily triggers lender, escrow, and credit-control responses, and Defendants issued and invoked that termination with the purpose and effect of causing Plaintiffs' lenders to suspend funding, impair credit, and disrupt Plaintiffs' financial relationships across multiple projects.

## I. RESULTING HARM TO PLAINTIFFS

77. As a direct and proximate result of Defendants' coordinated and intentional scheme to cut off funding, fabricate and invoke false terminations, interfere with lenders, and seize control of Plaintiffs' projects, Plaintiffs Barnhart Builders LLC and Peter Barnhart suffered severe and cascading financial, professional, and reputational harm far exceeding any ordinary construction or contract dispute.

78. Plaintiffs were stripped of control over construction-loan proceeds generated by their own labor, planning, and project management, and were wrongfully denied payment for completed work while Defendants retained both the physical improvements and the loan funds associated with that work.

79. By intentionally collapsing Plaintiffs' cash flow and severing Plaintiffs from their lender-controlled payment channels, Defendants forced Plaintiffs into a liquidity crisis that prevented timely payment of subcontractors, suppliers, and labor, exposing Plaintiffs to lien claims, credit impairment, and operational paralysis.

80. Defendants' false "terminations for cause" were deliberately injected into the construction-lending ecosystem and were relied upon by lenders and financial counterparties, causing Plaintiffs to be branded as dishonest, incompetent, or in default when no such default

24

existed, thereby destroying goodwill, impairing financing, and poisoning Plaintiffs' reputation across multiple projects.

81. Defendants' interference with lender draw systems and payment channels on the Schmidt and Filipucci projects caused freezes, diversions, and funding suspensions that cascaded into Plaintiffs' broader business operations, crippling Plaintiffs' ability to pay subcontractors, maintain creditworthiness, obtain or renew financing, and continue operating as a functioning construction enterprise.

82. As a direct and proximate result of Defendants' coordinated use of lender-channel communications, "for-cause" termination positioning, and subcontractor-facing false narratives that branded Plaintiffs as unreliable or in default when no such default existed, Plaintiffs lost multiple identifiable and reasonably probable future construction projects, including projects promised by members of the Filipucci family, referral-based prospects in the same residential development, and at least one borrower financed through Defendant Rural 1st with whom Plaintiffs met on-site to discuss a new build prior to selection of a general contractor. These were not speculative hopes, but established business expectancies and active project opportunities that would have generated substantial profits absent Defendants' misconduct, resulting in lost profits reasonably estimated to exceed $350,000.

83. Plaintiffs were forced into emergency survival mode — expending extraordinary time, legal expense, and managerial resources merely to preserve lien rights, defend their reputation, and prevent total business collapse — instead of building homes, generating revenue, and serving their customers.

25

84. Plaintiff Peter Barnhart personally suffered reputational injury with banks, subcontractors, and clients, acute financial distress, and the destruction of long-standing professional relationships built over many years in the construction and lending community.

85. These harms were not accidental, incidental, or the result of ordinary contractual friction; they were the predictable and intended consequences of Defendants' coordinated plan to remove Plaintiffs from profitable projects, seize control of the associated financial streams, and leave Plaintiffs holding the debt, liability, and reputational wreckage.

86. As a result, Plaintiffs have suffered and continue to suffer lost profits, diverted loan proceeds, destruction of business goodwill, credit impairment, litigation and enforcement costs, and ongoing economic damages in an amount to be determined at trial, but far exceeding the jurisdictional thresholds of this Court.

## VI.  PRETEXTUAL PERFORMANCE DEFENSES AND IRRELEVANCE TO FEDERAL CLAIMS

87. Defendants are expected to attempt to justify their conduct by alleging performance, workmanship, or construction-quality issues. Any such allegations are pretextual, were never asserted before Defendants cut off funding and issued false terminations, and — even more than two months later — have still not been formally identified, documented, or asserted as grounds for nonpayment.

88. Even if Defendants were to later assert construction-quality complaints, such allegations would not authorize Defendants to freeze, divert, or reroute construction-loan proceeds; interfere with lender relationships; issue false "for-cause" terminations; or transmit misleading or adverse information to federally regulated financial institutions. Those acts constitute independent torts and federal violations regardless of any underlying contract dispute.

89. Defendants' scheme was executed before any performance dispute was ever raised and therefore cannot be excused, justified, or immunized by after-the-fact allegations of workmanship. Such allegations are irrelevant to Defendants' wrongful diversion of funds, lender interference, misuse of legal process, and coordinated financial and reputational attacks directed at Plaintiffs' business and credit.

90. The filing of a mechanic's lien does not authorize a lender to divert construction-loan proceeds to borrowers, override a designated builder payee, or withhold escrowed funds absent a court order, and therefore cannot justify Defendants' freezing or redirection of funds owed to Plaintiffs.

91. Parallel state-court proceedings concerning contract performance or lien enforcement do not and cannot authorize the use of false default claims or lender interference to manipulate federally regulated lending and escrow systems, and therefore do not bar or limit this Court's jurisdiction over Defendants' lender interference, wire-based misconduct, and financial-institution abuse.

## VII.   COUNTS

### J.   COUNT I – Tortious Interference with Contract and Business Relations *(Against Defendants Jessica Schmidt, Brian Schmidt, Jason Filipucci, Nina Filipucci, and Zachary Selvey)*

92. Plaintiffs incorporate by reference all preceding paragraphs as if fully restated herein.

93. Plaintiffs had valid and existing contractual and business relationships, including but not limited to:

a. written construction contracts with Defendants Jessica and Brian Schmidt and Defendants Jason and Nina Filipucci;

b. subcontractor, supplier, and trade-partner relationships related to those projects; and

c. ongoing lender, inspection, and draw-payment relationships necessary for Plaintiffs' construction operations and cash flow.

94. Defendants Schmidt, Filipucci, and Selvey had actual knowledge of Plaintiffs' contractual and business relationships and knew that Plaintiffs' continued performance, payment, and professional standing depended upon those relationships.

95. Acting intentionally, knowingly, and in concert with one another, and without lawful justification or privilege, Defendants interfered with Plaintiffs' contracts and business relationships by, among other acts:

a. issuing, disseminating, and relying upon false and pretextual "terminations for cause";

b. instructing, encouraging, or inducing subcontractors and vendors to cease work, disengage from Plaintiffs, or question Plaintiffs' integrity;

c. communicating false, misleading, or damaging information to lenders, inspectors, and third parties concerning Plaintiffs' performance, contractual status, and financial reliability; and

d. coordinating across multiple projects to isolate Plaintiffs from their normal payment, inspection, and performance channels.

96. Defendants' conduct was intentional, malicious, and wrongful, was not privileged or justified by any legitimate dispute, and was undertaken for the purpose of forcing Plaintiffs out of the projects, seizing the economic benefits of Plaintiffs' work, and destroying Plaintiffs' standing in the construction and lending community.

97. As a direct and proximate result of Defendants' interference, Plaintiffs suffered loss of contract rights, disruption and collapse of subcontractor relationships, impairment of lender

confidence, loss of ongoing and prospective business opportunities, and substantial financial harm.

98. Plaintiff Peter Barnhart was individually and directly harmed by Defendants' conduct through injury to his personal and professional reputation, loss of business standing, and impairment of his relationships with lenders, subcontractors, and customers who relied upon his personal credibility, performance, and integrity.

99. Defendants' conduct was willful, wanton, and undertaken with conscious disregard for Plaintiffs' rights, entitling Plaintiffs to compensatory damages, consequential damages, punitive damages, and all available equitable relief.

## K. COUNT II – Conversion and Misappropriation of Construction Loan Proceeds
*(Against Defendants Rural 1st, Jessica Schmidt, Brian Schmidt, Jason Filipucci, and Nina Filipucci)*

100.    Plaintiffs incorporate by reference all preceding paragraphs as if fully restated herein.

101.    Plaintiffs performed substantial construction, project management, and subcontractor coordination on the Schmidt and Filipucci projects, generating construction-loan draws, retainage, and final contract balances that constituted Plaintiffs' property and right to payment.

102.    On the Filipucci project, the construction lender paid multiple construction draws directly to Plaintiffs based on Plaintiffs' completed work and lender-approved inspections, confirming Plaintiffs' status as the builder of record and the rightful recipient of loan proceeds generated by that work.

103.    When Defendant Selvey issued a purported termination of Plaintiffs' contract with the Filipucci Defendants, Plaintiffs became immediately entitled to payment of all work

29

performed to date, including retainage and the final contract balance then due under the construction agreement.

104.     Despite Plaintiffs' entitlement to those funds, Defendants Jason and Nina Filipucci wrongfully retained, controlled, or caused to be withheld construction-loan proceeds and contract balances generated by Plaintiffs' work, refusing to release payment while continuing to benefit from the improvements, inspections, and subcontractor labor Plaintiffs had provided.

105.     On the Schmidt project, Defendant Rural 1st likewise exercised control over federally regulated construction-loan proceeds and escrowed draw funds generated by Plaintiffs' work and, in coordination with the Schmidt Defendants, diverted, froze, or redirected those funds away from Plaintiffs despite Plaintiffs' earned right to payment.

106.     Defendants' control, retention, diversion, and misapplication of construction-loan proceeds constituted conversion and misappropriation of Plaintiffs' property, as Defendants exercised dominion over escrowed construction-loan funds transmitted and controlled through federally regulated financial institutions to which Plaintiffs had an immediate right of possession and payment.

107.     Defendants knew or should have known that the loan proceeds they withheld or redirected belonged to Plaintiffs and were generated solely by Plaintiffs' labor, planning, and performance.

108.     As a direct and proximate result of Defendants' conversion and misappropriation, Plaintiffs suffered loss of earned contract balances, exposure to subcontractor and supplier claims, damage to credit and cash flow, and substantial financial harm.

109. Defendants' conduct was willful, wanton, and undertaken in conscious disregard of Plaintiffs' rights, entitling Plaintiffs to compensatory and punitive damages, disgorgement of wrongfully withheld funds, and all available equitable relief.

## L. COUNT III – Lender Interference and Financial Institution Misuse *(Against All Defendants)*

110. Plaintiffs incorporate by reference all preceding paragraphs as if fully restated herein.

111. Plaintiffs' construction business depends upon access to construction lenders, escrowed draw systems, lender inspections, and federally regulated wire and disbursement channels to fund work, pay subcontractors, and perform ongoing projects.

112. Defendants knew that Plaintiffs' ability to operate depended on maintaining the confidence, cooperation, and proper functioning of Plaintiffs' construction lenders and the federally regulated financial systems they administer.

113. Acting in concert, Defendants intentionally interfered with Plaintiffs' lender relationships and misused federally regulated financial institutions by, among other things:

a. Transmitting or causing to be transmitted false, misleading, or incomplete information concerning Plaintiffs' performance, contractual status, or entitlement to payment;

b. Issuing and disseminating pretextual written "for-cause" termination notices on the Filipucci project and attorney-driven default accusations on the Schmidt project to lenders, inspectors, and escrow administrators;

c. Causing lenders to freeze, delay, reroute, or misdirect construction-loan proceeds and draw payments owed to Plaintiffs;

d. Using the authority of lenders and escrow systems as a financial weapon to force Plaintiffs out of their projects; and

e. By funding Defendants' takeover while withholding Plaintiffs' earned draws, Defendant Rural 1st abandoned its neutral role as lender and escrow administrator and became a knowing participant in Defendants' scheme.

114. Defendants' conduct corrupted and exploited the normal operation of federally regulated construction-loan, escrow, and wire-transfer systems, transforming neutral financial institutions into instruments of Defendants' wrongful scheme.

115. These transfers, freezes, and diversions were executed through interstate wire and electronic payment channels administered by federally regulated financial institutions and governed by applicable banking rules and funds-transfer frameworks, including lender-administered escrow and electronic disbursement controls, and the misuse of those systems formed the financial instrumentality of Defendants' scheme.

116. As a direct and proximate result of Defendants' lender interference and financial institution misuse, Plaintiffs were deprived of earned loan proceeds, suffered severe disruption of cash flow, and experienced damage to their creditworthiness, lender relationships, and ability to continue operating as a construction business.

117. Plaintiff Peter Barnhart was individually harmed by Defendants' conduct through reputational injury with lenders and financial institutions, heightened scrutiny and restrictions on future financing, and the erosion of trust necessary to operate in the construction lending environment.

118. Defendants' conduct was willful, knowing, and undertaken in conscious disregard of Plaintiffs' rights, entitling Plaintiffs to compensatory and punitive damages and all appropriate equitable relief.

**M. COUNT IV – Civil Conspiracy** *(Against All Defendants)*

119. Plaintiffs incorporate by reference all preceding paragraphs as if fully restated herein.

120. Defendants knowingly combined, agreed, and acted together in a common plan and scheme to obstruct Plaintiffs' access to construction-loan proceeds, force Plaintiffs out of their projects, damage Plaintiffs' reputation with lenders and subcontractors, and seize the economic benefits of Plaintiffs' work.

121. Each Defendant played a distinct but complementary role in the conspiracy, including but not limited to:

a. Homeowners issuing or soliciting false terminations and withholding payment;

b. Defendant Selvey using the appearance of legal process to legitimize and enforce the scheme; and

c. Defendant Rural 1st using its control over escrowed construction-loan funds to implement and carry out the financial cutoff.

122. Defendants committed overt acts in furtherance of the conspiracy, including transmitting false information to lenders, issuing pretextual termination notices, freezing or diverting loan proceeds, and coordinating across multiple projects to isolate Plaintiffs from their normal sources of funding and performance.

123. Defendants knew or reasonably should have known that their conduct was unlawful and would result in severe financial, professional, and reputational harm to Plaintiffs.

124. As a direct and proximate result of Defendants' conspiracy, Plaintiffs suffered loss of contract rights, misappropriation of funds, damage to credit and business relationships, reputational harm, and substantial financial losses.

125.     Plaintiff Peter Barnhart was individually targeted and harmed by the conspiracy, suffering damage to his professional reputation with lenders, subcontractors, and customers, loss of goodwill and business standing, and severe financial and emotional distress.

126.     Defendants are jointly and severally liable for all damages caused by the conspiracy, including compensatory damages, consequential damages, lost profits, and punitive damages, as well as all appropriate equitable relief.

N. **COUNT V – Abuse of Process and Wrongful Use of Legal Process** *(Against Defendants Zachary Selvey, Jason Filipucci, Nina Filipucci, and Jessica Schmidt)*

127.     Plaintiffs incorporate by reference all preceding paragraphs as if fully restated herein.

128.     Defendant Zachary Selvey, acting as counsel for Defendants Jason and Nina Filipucci, issued a written "for-cause" Notice of Termination asserting contractual default, misconduct, and non-performance by Plaintiffs, and ordering Plaintiffs to vacate the Filipucci jobsite and surrender control of the project.

129.     That Notice of Termination was not issued for the purpose of seeking adjudication or good-faith contract remedies, but rather to create the false legal appearance of default in order to justify freezing payments, triggering lender and escrow intervention, excluding Plaintiffs from the project, and enabling Defendants to retain the economic benefits of Plaintiffs' work.

130.     Selvey and the Filipucci Defendants caused the Notice of Termination and its asserted legal status to be transmitted to lenders, inspectors, subcontractors, and third parties with the intent that those parties would rely upon it to withhold funds, sever business relationships, and treat Plaintiffs as having been removed for cause.

131.     On the Schmidt project, Defendants Selvey and Jessica Schmidt likewise asserted and transmitted formal legal claims of "for-cause" default, overbilling, and contractual wrongdoing through attorney-driven communications to lenders and third parties in order to trigger financial cutoffs, justify nonpayment, and seize control of the project, despite the absence of any bona fide default or adjudication.

132.     Defendants' use of attorney-issued legal accusations and termination instruments as financial and reputational weapons constituted an abuse of legal process, because legal mechanisms were used to obtain economic leverage and lender intervention rather than to resolve any legitimate dispute.

133.     As a direct and proximate result of Defendants' abuse of process, Plaintiffs suffered loss of earned funds, disruption of lender and subcontractor relationships, exclusion from job sites, reputational injury, emotional distress, and substantial financial harm.

134.     Defendants' conduct was willful, malicious, and undertaken in bad faith, entitling Plaintiffs to compensatory and punitive damages and all appropriate equitable relief.

**O. COUNT VI – Defamation, False Light, and Business Disparagement** *(Against Defendants Jessica Schmidt, Brian Schmidt, Jason Filipucci, Nina Filipucci, and Zachary Selvey)*

135.     Plaintiffs incorporate by reference all preceding paragraphs as if fully restated herein.

136.     Defendants published and caused to be published false statements of fact about Plaintiffs, including statements and implications that Plaintiffs were in default, were terminated "for cause," had failed to perform, or were otherwise unfit, untrustworthy, or incompetent to continue performing their construction contracts.

35

137. Defendant Selvey authored and issued a purported "for-cause" termination of Plaintiffs' contracts without any notice of default, opportunity to cure, or identification of any material breach, thereby falsely conveying that Plaintiffs had engaged in misconduct or deficient performance.

138. Defendants Schmidt and Filipucci adopted, repeated, and disseminated the false termination and its implications to lenders, inspectors, subcontractors, suppliers, and other third parties, knowing that those parties would rely on the statements in deciding whether to continue funding projects, doing business with Plaintiffs, or honoring Plaintiffs' payment rights.

139. The statements and implications that Plaintiffs were terminated for cause, in default, or had failed to perform were false, misleading, and made with knowledge of their falsity or with reckless disregard for the truth.

140. Defendants' statements constituted defamation per se and business disparagement because they directly impugned Plaintiffs' honesty, integrity, and fitness to conduct their trade and profession as construction contractors.

141. Defendants also placed Plaintiffs in a false light by publicly portraying them as having been removed for wrongdoing or incompetence, when in fact no such default or cause existed.

142. Defendants made and published the false statements for the purpose of justifying the withholding and diversion of construction-loan proceeds, disrupting Plaintiffs' lender and subcontractor relationships, and forcing Plaintiffs out of their projects for Defendants' financial advantage.

36

143. As a direct and proximate result of Defendants' defamatory and disparaging statements, Plaintiffs suffered reputational harm, loss of business opportunities, damage to lender confidence, impaired credit and financing relationships, emotional distress, and substantial financial losses.

144. Defendants' conduct was willful, malicious, and undertaken with conscious disregard for Plaintiffs' rights, entitling Plaintiffs to compensatory and punitive damages and all available equitable relief.

### P. COUNT VII – Declaratory Judgment *(Against All Defendants)*

145. Plaintiffs incorporate by reference all preceding paragraphs as if fully restated herein.

146. An actual and justiciable controversy exists between Plaintiffs and Defendants concerning whether Plaintiffs were ever in default, breached their contracts, or were lawfully terminated "for cause" on the Schmidt and Filipucci projects.

147. Defendants have asserted and continue to assert that Plaintiffs were in default, overbilled, failed to perform, or otherwise committed contractual or professional wrongdoing, without ever providing Plaintiffs with any, specific, or good-faith notice of any alleged breach, and have relied on those unsupported assertions to justify withholding and diverting construction-loan proceeds through federally regulated lending and escrow systems, excluding Plaintiffs from job sites, and damaging Plaintiffs' reputation with lenders, subcontractors, and third parties.

148. Plaintiffs deny that any such default, breach, or for-cause termination ever occurred. Plaintiffs substantially performed their contractual obligations, generated lender-approved draws, and to date have never been provided with any notice of default, opportunity to cure,

or good-faith identification of any material breach either prior to or following Defendants' financial cutoff and project takeover.

149.     A judicial declaration is necessary and appropriate to determine and declare the parties' rights and legal relations, including that Plaintiffs were not in default, were not lawfully terminated for cause, and remain entitled to payment for all work performed, including retainage and final contract balances.

150.     Without declaratory relief, Defendants will continue to rely on the false narrative of "for-cause" termination to interfere with Plaintiffs' federally regulated lender relationships and escrowed draw processes, justify nonpayment, and inflict ongoing reputational and financial harm.

151.     Plaintiffs therefore seek a declaration that Defendants' claims of default and for-cause termination are false and without legal effect, and that Plaintiffs are entitled to all earned and unpaid construction-loan proceeds and contract balances on the Schmidt and Filipucci projects, together with all further monetary and equitable relief that flows from that declaration, including lost profits and expectancy damages caused by Defendants' wrongful cutoff and project takeover.

**Q. COUNT VIII – Civil RICO (18 U.S.C. § 1962(c) and (d))** *(Against All Defendants)*

152.     Plaintiffs incorporate by reference all preceding paragraphs as if fully restated herein.

### a. The RICO Enterprise

153.     At all relevant times, Defendants Rural 1st, Jessica Schmidt, Brian Schmidt, Jason Filipucci, Nina Filipucci, and Zachary Selvey constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4), associated in fact and functioning as a continuing unit for

38

the common purpose of forcing Plaintiffs out of profitable construction projects, diverting or withholding construction-loan proceeds, and seizing the economic value of Plaintiffs' work.

154.     The enterprise had defined relationships and structure, including coordinated roles among homeowners, legal counsel, and financial-institution actors, and functioned as a continuing unit across multiple projects and lenders by using the same methods of false default claims, lender interference, and payment obstruction to seize the economic benefits of Plaintiffs' work.

### b. Conduct and Participation

155.     Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who **conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs**, within the meaning of *Reves v. Ernst & Young*, 507 U.S. 170 (1993), by exercising control over, or knowingly implementing, the false default claims, attorney-driven status changes, and lender-controlled payment mechanisms that carried out the enterprise's scheme.

156.     Defendants carried out the enterprise through coordinated use of false "for-cause" terminations, attorney-driven default accusations, and **Rural 1st's knowing implementation of draw freezes, payment redirections, and escrow controls** to freeze, divert, and misapply construction-loan proceeds owed to Plaintiffs.

157.     The enterprise's scheme depended on the use of interstate wire and electronic communications and lender-controlled disbursement systems; the diversion, withholding, and redirection of construction-loan funds could not have been executed as alleged without those interstate wire facilities and electronic payment channels.

39

158.    Those interstate wire and electronic communications were not incidental to a contract dispute, but were the means by which Defendants caused lender and escrow personnel to alter payment status, override payee designations, freeze draw disbursements, and redirect construction-loan proceeds away from Plaintiffs and into the control of homeowner Defendants.

### c.  Interstate Commerce

159.    At all relevant times, the activities of the enterprise affected interstate commerce, including through the use of interstate wire communications, electronic banking and escrow systems, and federally regulated financial institutions in connection with the transmission, control, and diversion of construction-loan funds.

### d.  Pattern of Racketeering Activity

160.    Defendants committed at least two acts of racketeering activity within ten years in violation of 18 U.S.C. § 1961(1), including but not limited to:

a. Wire Fraud (18 U.S.C. § 1343) — transmitting and causing to be transmitted false and misleading communications through lender email systems, electronic draw portals, and other interstate wire facilities to federally regulated financial institutions, including to falsely report or imply contractor default, overbilling, or termination in order to trigger draw freezes, payment redirection, and the withholding of construction-loan proceeds owed to Plaintiffs. The wire communications were false and misleading because they represented or implied that Plaintiffs were in default, had been terminated for cause, or were no longer entitled to payment, when in fact no notice of default had been issued, no opportunity to cure had been provided, and Plaintiffs had already performed and generated lender-approved draws under the governing disbursement authorization.

b. Financial Institution Fraud (18 U.S.C. § 1344) — executing and attempting to execute a scheme to obtain and control money under the custody and control of federally regulated financial institutions by means of false and fraudulent pretenses, including the transmission of false claims of contractor default, overbilling, and "for-cause" termination into lender draw and escrow systems to cause the freezing, withholding, or redirection of construction-loan proceeds owed to Plaintiffs. Defendants' false pretenses were directed into the lender's disbursement apparatus for the purpose of causing the financial institution to release, redirect, or withhold funds contrary to the established payee designation and the lender's own draw administration.

161. These predicate acts were related and continuous because they employed the same methods—false default claims, attorney-driven legal status changes, and lender-level payment interference—across multiple projects and multiple lenders, were directed at the same victims, and formed a closed-ended pattern of racketeering activity designed to force Plaintiffs out of profitable construction projects, deprive them of their primary source of income, and seize the economic value of Plaintiffs' work.

### e. Injury and Causation

162. Defendants' racketeering conduct was the direct and proximate cause of Plaintiffs' injury to their business and property, including the loss of earned construction-loan proceeds and escrowed funds, destruction of lender and subcontractor relationships, loss of goodwill, impairment of credit and financing access, and lost profits from projects that were forcibly terminated or taken over through Defendants' misuse of federally regulated lending and payment systems.

### f. RICO Conspiracy

163.     Defendants knowingly agreed and conspired to conduct and participate in the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d), with each Defendant understanding the essential nature of the plan and knowingly performing distinct and complementary roles across multiple and separate construction projects, including homeowners supplying and adopting false default narratives, Defendant Selvey providing legal instruments and attorney-driven communications to give those narratives formal effect, and Defendant Rural 1st exercising control over lender draw and escrow systems to implement the resulting payment freezes and fund diversions.

### g. Damages

164.     Plaintiffs are entitled to recover **treble damages, costs of suit, and reasonable attorney's fees** pursuant to 18 U.S.C. § 1964(c) for all losses caused by Defendants' racketeering conduct, including misappropriated construction-loan proceeds, lost profits, damage to goodwill and credit, and the costs of protecting and enforcing Plaintiffs' rights, together with **disgorgement of all proceeds wrongfully obtained** and all appropriate injunctive and equitable relief under 18 U.S.C. § 1964(a) to prevent Defendants from continuing or repeating their unlawful scheme.

## VIII.   INJUNCTIVE AND EQUITABLE RELIEF

165.     Defendants' conduct is ongoing, coordinated, and designed to continue depriving Plaintiffs of construction-loan proceeds, business relationships, and professional standing unless restrained by this Court.

166.     Defendants have issued and disseminated false and pretextual claims of "for-cause" default, including written termination notices on the Filipucci project and attorney-driven default accusations on the Schmidt project, and continue to rely upon those

42

communications to obstruct payments, divert loan proceeds, and justify continued interference with Plaintiffs' projects and financing relationships.

167. Monetary damages alone are inadequate to remedy Defendants' conduct because Plaintiffs face continuing and irreparable harm in the form of destroyed business reputation, loss of lender confidence, severed subcontractor relationships, and the ongoing risk of permanent exclusion from financing and future construction work.

168. Absent immediate injunctive relief, Defendants will continue to exploit the false terminations and lender-level interference to choke off Plaintiffs' access to capital through federally regulated lending and escrow systems, impair Plaintiffs' creditworthiness, and prevent Plaintiffs from performing or completing projects for which they remain the rightful contractor of record.

169. Plaintiffs therefore seek a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants, and all persons acting in concert with them, from:

a. Representing or implying to any lender, escrow agent, inspector, subcontractor, or third party that Plaintiffs were terminated for cause, in default, or removed for misconduct

b. Communicating false, misleading, or incomplete information regarding Plaintiffs' performance, contractual status, or entitlement to payment;

c. Interfering with, redirecting, freezing, or withholding construction-loan proceeds, draws, retainage, or escrowed funds earned by Plaintiffs;

d. Instructing or encouraging any lender, title company, inspector, or escrow agent to bypass Plaintiffs as the builder of record or to divert funds to homeowners or third parties;

e. Taking any further action designed to impair Plaintiffs' access to financing, subcontractors, or the normal channels of construction payment.

170. Plaintiffs further seek an order requiring Defendants to take affirmative corrective action, including but not limited to issuing written retractions and clarifications to all lenders, subcontractors, and third parties who received the false termination or related communications, confirming that Plaintiffs were not terminated for cause and that no performance default existed.

171. Plaintiffs also seek an order restoring Plaintiffs as the recognized builder of record for purposes of lender inspections, draw approvals, and payment disbursements, and prohibiting any lender or escrow agent from bypassing Plaintiffs or redirecting earned funds, on the Schmidt and Filipucci projects pending final resolution of this action.

172. The balance of equities strongly favors Plaintiffs because Defendants have no legitimate interest in continuing to disseminate false information or interfere with Plaintiffs' funding, while Plaintiffs face existential harm to their business if Defendants' conduct is allowed to continue.

173. Injunctive relief will serve the public interest by preventing abuse of legal process, protecting the integrity of federally regulated construction-lending and escrow systems, and deterring the use of false legal notices to manipulate, weaponize, and corrupt financial institutions in order to strip small businesses of their earned funds and credit access.

IX. CONCLUSION

174. Defendants did not merely breach contracts or engage in ordinary project disputes. They **converted a federally regulated construction-lending system into a private weapon**—using attorney-issued termination notices, lender-controlled draw portals, and

wire-based escrow mechanisms to **cut off a functioning construction business from the very payment streams its labor had created**.

175. Plaintiffs did not lose money because of failed performance. They lost money because **Defendants seized control of federally regulated financial infrastructure** and used it to **override written payee designations, freeze earned funds, and redirect wire-based disbursements** to themselves while leaving Plaintiffs holding the labor, materials, liability, and reputational fallout.

176. A contractor can survive criticism. A contractor can survive disagreement. But **no contractor can survive when a lender, an attorney, and borrowers coordinate to weaponize escrow systems and wire controls to erase the contractor from its own projects while keeping the money.**

177. What Defendants did here was not merely wrongful—it was **structural**. They exploited **interstate wire systems, federally regulated financial institutions, and lender escrow controls** not to resolve disputes, but to **engineer financial extinction** of a contractor who had already performed.

178. The result was inevitable and intended: Plaintiffs were stripped of earned payments, cut off from their lenders, branded as defaulters without notice or cure, and forced into cascading financial and reputational collapse—**all while Defendants retained the homes, the improvements, and the money**.

179. This case therefore lies at the heart of federal law: It concerns the **misuse of federally regulated financial institutions, interstate wire systems, and escrow mechanisms** to commit **systematic economic predation** against a small business.

45

180.     Federal courts exist to stop exactly this kind of abuse—when private actors turn regulated financial systems into instruments of extortion, exclusion, and theft. The law does not permit it. Equity does not tolerate it. And justice demands that Defendants be held fully accountable.

## X.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Barnhart Builders LLC and Peter Barnhart respectfully request that this Court enter judgment in their favor and against Defendants, and award the following relief:

181.     A declaration that Plaintiffs were not in default, were not lawfully terminated for cause, and did not engage in any misconduct, overbilling, or contractual wrongdoing on the Schmidt or Filipucci projects;

182.     A declaration that Defendants' claims of default and for-cause termination are false, void, and without legal effect, and that Plaintiffs are entitled to all earned and unpaid construction-loan proceeds, retainage, and contract balances on those projects;

183.     A temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants and all persons acting in concert with them from making or disseminating false statements of default, interfering with Plaintiffs' lender relationships, freezing or diverting construction-loan proceeds, or otherwise impairing Plaintiffs' access to financing and payment systems;

184.     An order requiring Defendants to retract and correct all false statements and default claims communicated to any lender, inspector, subcontractor, or third party concerning Plaintiffs' performance or contractual status;

185.    An order restoring Plaintiffs as the recognized builder of record and rightful payee for purposes of lender inspections, draw approvals, and payment disbursements on the Schmidt and Filipucci projects;

186.    An award of compensatory damages for all losses caused by Defendants' conduct, including misappropriated construction-loan proceeds, lost profits from both terminated and lost future construction projects, loss of business expectancy, damage to goodwill, reputational harm, and impairment of credit and financing relationships;

187.    An award of treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c) for Defendants' RICO violations;

188.    An award of punitive damages against Defendants for their willful, malicious, and oppressive conduct;

189.    An award of all equitable relief necessary to prevent Defendants from continuing or repeating their unlawful scheme, including monitoring, reporting, and corrective actions with respect to lender communications;

190.    Pre-judgment and post-judgment interest as allowed by law; and

191.    Such other and further relief as the Court deems just and proper.

## XI.    JURY DEMAND

192.    Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Peter Barnhart

Peter Barnhart
Barnhart Builders LLC
Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on **January 16, 2026**, a true and correct copy of the **Summons and Complaint** in this action was served upon the Defendants listed below by **Certified Mail, Return Receipt Requested**, in accordance with **Federal Rule of Civil Procedure 4(c)(1) and 4(e)(1)** and **Ohio Rule of Civil Procedure 4.1(A)**, addressed as follows:

RURAL 1ST / FARM CREDIT MID-AMERICA
12501 Lakefront Place, Louisville, KY 40299

Zachary Selvey
107 N. Main St. P.O. Box 28, Clyde, Ohio 43410-0028

Dewey, Selvey, and Liska Attorneys
107 N. Main St. P.O. Box 28, Clyde, Ohio 43410-0028

Jessica Schmidt
5310 Bardshar Rd. Sandusky, Ohio 44870

Brian Schmidt
5310 Bardshar Rd. Sandusky, Ohio 44870

Jason Filipucci
5712 Deloris Dr. Castalia, Ohio 44824

Nina Filipucci
5712 Deloris Dr. Castalia, Ohio 44824

Respectfully submitted,

/s/Peter Barnhart
Peter Barnhart
Barnhart Builders LLC
Plaintiffs
910 Windamere Lane
Sandusky, Ohio 44870
(419) 370-1918
peterbarnhart01@gmail.com

48